# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 12, 2001 Session

## STATE OF TENNESSEE v. WILLIAM BINKLEY

### Appeal from the Circuit Court for Rutherford County
### No. F-47453    James K. Clayton, Jr., Judge

---

### No. M2001-00404-CCA-R3-CD - Filed April 5, 2002

---

A Rutherford County jury convicted the defendant, William Binkley, of criminal attempt to commit first-degree murder and reckless endangerment in connection with the shooting of the defendant's former girlfriend. The trial court sentenced the defendant as a Range I standard offender to 23 years in the Department of Correction for the attempted first-degree murder conviction and to two years for the reckless endangerment conviction. The sentences were ordered to be served consecutively for an effective sentence of 25 years. Primarily aggrieved that he was not allowed to offer expert testimony about his mental responsibility, the defendant appeals the trial court's evidentiary ruling. Secondarily, he questions the sufficiency of the evidence, and he complains that all relevant lesser-included offenses were not included in the jury instructions. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Joe M. Brandon, Jr., Smyrna, Tennessee, for the Appellant, William Binkley.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William C. Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General for the Appellee, State of Tennessee.

## OPINION

On the afternoon of March 2, 1999, Julia Fisher heard an unusual noise at the back door of her house, which was located on Jackson Ridge Road in the Rockvale community. When she went to investigate, Ms. Fisher discovered her next-door neighbor, Melissa Tucker, lying on her side on the pavement outside the back door. Ms. Tucker was bleeding profusely. Ms. Fisher summoned medical help, and Ms. Tucker was transported to Middle Tennessee Medical Center in

Murfreesboro. Dr. Wayne Westmorland, an emergency room surgeon, performed an initial assessment and determined that Ms. Tucker had a gunshot wound to the right side of her chest and was bleeding to death. Dr. Westmorland took Ms. Tucker to the operating room and successfully performed emergency surgery to stop the hemorrhage. The path of the bullet damaged the right upper lobe of her right lung, requiring the removal of a portion of her lung. Ms. Tucker eventually recovered from her injuries.

Shortly following the shooting, the defendant showed up at Rockvale Elementary School where the victim's sister, Cynthia Morris, worked. The defendant had his and the victim's three year-old son with him in his vehicle. The defendant told Ms. Morris to take the crying child, and he stated that he had just shot Ms. Morris's sister. The defendant drove away from the school, and he was next spotted when he stopped and parked his car at the Rutherford County Sheriff's Department's sally port. There the defendant encountered several detectives to whom he reported that he had shot someone and that the gun was inside his vehicle. Not surprisingly, the detective arrested the defendant, and the defendant was later charged with attempted first degree murder, Tenn. Code Ann. §§ 39-12-101 (1997), 39-13-202 (Supp. 2001), and felony reckless endangerment, Tenn. Code Ann. § 39-13-103 (1997).

At trial, the state presented a thorough and straightforward case. We summarize and report the trial proof from the vantage point most favorable to the state.

The victim was the state's first witness. She testified that she and the defendant met in 1993. Shortly thereafter they began cohabiting, and in 1995 the couple had a child. During their relationship, the victim and the defendant had separated once or twice, the last time being on Super Bowl Sunday in January 1999. The couple had been living in Shelbyville, but the victim and the child moved to Rutherford County.

On Tuesday morning, March 2, 1999, the victim was at her house with the child. The defendant called at 9:30 a.m., and when the victim answered the phone, he said, "Hello. Why did you lie to me?" The victim expressed puzzlement, whereupon the defendant complained that instead of spending the weekend with him, she was working. Exasperated, the victim blurted out that they were never going to get back together, so each of them needed to go ahead with their lives. She assured the defendant that he could see their child at any time but that she just could not live with him.

Approximately three hours later, the defendant came to the victim's house. The front door was open, and the defendant entered by way of the unlocked screened door. The victim was sitting on the couch in her living room; she was talking to her mother on the telephone, and the child was near an end table on the side of the couch where the victim was seated. The defendant walked up to the victim and asked to whom the victim was speaking. She replied that it was her mother. The defendant then stated, "Hang up the phone, tell her bye, I'm here to kill you." The victim looked away "for a split second," and when she looked back, the defendant was pointing a nine millimeter revolver at her. The victim hung up the telephone, begged the defendant not to shoot, and promised

to get back together with him. The defendant told her that he was "tired of being used." The victim started to rise from the couch, but before she could stand completely, the defendant shot her in the sternum from a distance of less than three feet. The victim managed to escape from her house to summon help from her neighbor.

Emma Lester and Patricia Johnson worked with the victim's sister, Cynthia Morris, in the cafeteria at Rockvale Elementary School. They were outside the school when the defendant drove onto the school grounds on March 2. They testified at trial that the defendant appeared normal. Lester and Johnson witnessed the defendant take his child out of the automobile and leave the child with Morris. Lester and Johnson also heard, and so testified at trial, the defendant tell Morris, "I just shot your sister." According to the women, before the defendant left, he also told Morris that he was going to "turn [himself] in to the law." At trial, the state called Morris to testify after the examination of Lester and Johnson was completed. Morris corroborated the account given by her co-workers of the defendant's behavior and statements.

The deputies at the Rutherford County Sheriff's Department, who came into contact with the defendant later that day, also testified at trial. All of the deputies testified that the defendant appeared normal. The first deputy who encountered the defendant was George Alexander. Deputy Alexander was preparing to get into his patrol vehicle parked in the sally port when the defendant drove up and stopped. Deputy Alexander testified that the defendant got out of his vehicle and volunteered, "I just shot someone." The defendant further told the deputy that "the gun is inside the car on the floorboard." Detective Troy Hooker was in the sally port at the same time; he testified that he overheard the defendant state that he had shot somebody out on Jackson Ridge Road. Detective Hooker saw the defendant point at the defendant's car and mention that the gun was inside.

The gun in the defendant's vehicle was confiscated and sent to the Tennessee Bureau of Investigation Crime Lab. Forensic firearms identification expert Don Carman testified at trial. He compared the weapon with a spent cartridge found in the victim's home, and in his opinion the cartridge was fired from the revolver. Dr. Westmoreland, who operated on Ms. Tucker, also testified at trial, and he described the entry and exit wounds from the shooting.

After the state rested, the defendant and two of his children testified. The defendant claimed to have no memory of the shooting. He testified that he recalled waking up that morning about 4:30 a.m. When he was unable to get back to sleep, he took a valium that had been given to him by the victim. The defendant testified that he had never before ingested valium. Eventually, the defendant fell back asleep. He stated that the next thing he remembered was being at the school; his child was crying, and he noticed blood on his hand. He turned the child over to Ms. Morris, and he testified that he told her that he thought he had "shot Melissa." The defendant testified that he did not recollect leaving the school, and the next event he could recall was being at the police station talking to Deputy Alexander.

As background for his actions on March 2, the defendant testified that before he and the victim last separated on Super Bowl Sunday he began experiencing troubling thoughts involving

killing his family. Shortly after the victim and the child moved out, he became depressed to the point that he voluntarily admitted himself to Highland Rim Medical Center. He testified that he did not stay long, however, because he did not like the medicine prescribed for him at the center. The defendant discharged himself from the center against medical advice, but on February 13 and again on February 20, the defendant went to see a local psychiatrist, Dr. Alex Fider. Dr. Fider prescribed haldol, celexa, and cogenten for the defendant, which he was taking at the time of the shooting. The defendant offered no expert evidence regarding how the medicine he was taking, alone or in conjunction with the single valium he took the morning before the shooting, may have affected his behavior. Indeed, the defendant testified at one point that the prescription medicine made him calmer.

On cross examination, the defendant admitted that he was jealous of the victim, but he insisted that he was not obsessed with her. Even so, the defendant wrote the victim a note after she left. The defendant was shown the note in which he expressed that he was afraid that someone would take the victim away from him and that she would find someone else when she went to work.

Two of the defendant's grown children testified for him. They portrayed their father as loving and non-abusive, and they testified that the defendant never appeared to them to be jealous of the victim. In rebuttal, the state called the victim's niece and sister-in-law, who contradicted the claim by the defendant's children that he was not jealous of the victim.

The jury deliberated and considered the evidence. The jury found the defendant guilty of attempted first-degree murder in connection with Ms. Tucker's shooting and guilty of reckless endangerment regarding his son who was present during the shooting.

## I. Sufficiency of the Evidence[1]

The defendant devotes two sentences in the argument section of his brief to contesting the sufficiency of the evidence to support his conviction of attempted first-degree murder. Not only has this issue been waived for failure to cite to any portion of the record, but it also is miscast as an evidence sufficiency argument.

First, the rules of this court clearly specify that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Waiver, we believe, is an appropriate disposition in this instance. *See State v. Schaller*, 975 S.W.2d 313 (Tenn. Crim. App. 1997). Second, the defendant couches his argument in terms of the inability of any rational juror to find "the essential elements beyond a reasonable doubt had the trial court of [sic] permitted testimony of Dr. Craig and Dr. Fider as it would relate to 'diminished capacity.'" The sufficiency of the convicting evidence, however, is examined in light of the evidence actually presented to the jury. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981). Evidence that a defendant claims was improperly excluded does

---

[1] We address the issues in this case in a different order than they have been presented in the defendant's brief.

not implicate the state's failure or success in proving its case; the remedy for the incorrect and prejudicially harmful rejection of evidence is reversal for trial error, not dismissal of the conviction. *See id.*[2]

## II. Exclusion of Expert Testimony

The defendant insists that the essence of his defense at trial was that at the time of the shooting, he lacked the requisite mental state for attempted first-degree murder. He proposed to support that theory of defense by eliciting expert testimony at trial from Drs. Craig and Fider. The defendant complains that the trial court improperly disallowed the expert testimony thereby depriving him of the means to challenge the state's case. We disagree that the testimony was erroneously excluded.

Pretrial, the defendant filed a notice of insanity defense and a notice of intention to introduce expert testimony at trial bearing on the defendant's mental state. A mental evaluation of the defendant was performed, and the evaluator advised the trial court and the parties that the defendant was competent to stand trial and that an insanity defense could not be supported. Slightly less than two weeks before the trial was scheduled to begin, the state filed a motion in limine seeking an order that the defendant refrain from interjecting "diminished capacity" into the trial until a jury-out hearing was held to determine the admissibility of any such evidence.

The state's motion was called for hearing approximately one week before trial. The defendant presented the testimony of Dr. Allen Craig and Dr. Alex Fider, the experts whom he anticipated using at trial. We briefly summarize their testimony to place the trial court's ruling in context.

Dr. Craig, a psychiatrist, encountered the defendant on February 2, 1999, when the defendant voluntarily admitted himself to the Harton Psychiatric Center in Tullahoma. Dr. Craig testified that the defendant did not want to take the prescribed medications, and he left against medical advice after spending only two nights at the Center. The defendant's abrupt departure preempted psychological testing. Based on the defendant's subjective manifestations and verbal account of his difficulties, Dr. Craig testified that the defendant had severe depression with possible psychotic features. In his medical notes, Dr. Craig also indicated that the defendant was having paranoid ideations stemming from his jealousy about Ms. Tucker and his intense fear that he would harm her.

Dr. Craig had no other contact with the defendant and, consequently, no opportunity to discuss with the defendant his thought process at the time of the shooting. Dr. Craig denied that

---

[2] At any rate, whether to accredit evidence of "diminished capacity" is a decision entrusted to the trier or fact, and a reviewing court will not substitute its judgment for that of the fact finder. *See, e.g., State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983) (jury verdict accredits evidence presented by the state and resolves all conflicts in favor of the state); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

the defendant was incompetent when evaluated in February, and Dr. Craig did not take the position that the defendant was insane at the time the offense was committed. Indeed, Dr. Craig detected no impairment in the defendant's ability to act intentionally or knowingly. In response to a question from the trial court, Dr. Craig disavowed any ability to offer an expert opinion about the defendant's mental state at the time of the shooting, which occurred a month after Dr. Craig's last contact with the defendant.

Dr. Alex Fider, a psychiatrist in private practice in Shelbyville, testified at the hearing that he first saw the defendant on February 13. Based upon his review of Dr. Craig's notes and the defendant's account of his symptoms, Dr. Fider arrived at a tentative "working" diagnosis of delusional disorder. Dr. Fider prescribed anti-depressant and anti-psychotic medications for the defendant. Dr. Fider saw the defendant a second and final time on February 20 for a follow-up visit to evaluate the efficacy of the prescribed medications. Dr. Fider testified that he could offer no opinion about the defendant's ability to premeditate and to act intentionally and knowingly. Moreover, based on his brief interaction with the defendant, Dr. Fider testified that he was not capable of offering an opinion to a reasonable degree of medical certainty that the defendant, in fact, suffered from a delusional disorder.

After hearing the testimony, the trial court ruled that the defendant would not be allowed to present his evidence of diminished capacity. The basis for the ruling was threefold. First, Dr. Craig's testimony was based entirely on subjective, rather than objective findings. Dr. Fider's testimony was similarly grounded with the exception that he spoke briefly with Ms. Tucker on the telephone about the medication's effect on the defendant. Second, both doctors were of the opinion that the defendant was not incompetent or insane and that he was able to act intentionally and knowingly. Last, neither one of the doctors could offer an opinion that the defendant was unable to act intentionally, knowingly, and with the requisite intent at the time of the commission of the offense.

The standard of admissibility of "diminished capacity" type evidence was succinctly coined in *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997).

> [T]o gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

Particularly apt to the case before us is the caveat in *Hall* that the testimony "must demonstrate" that the claimed inability to form the culpable mental state was "the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." *Id*. at 690. Admissibility, "as with most other evidentiary

questions, . . . is a matter which largely rests within the sound discretion of the trial court." *Id.* at 689.

Pursuant to the *Hall* standard of admissibility, we are of the opinion that the trial court did not abuse its discretion in excluding the testimony of Drs. Craig and Fider, which the defendant sought to present. At best, these psychiatrists had reached a diagnosis, which was far from definitive, that the defendant suffered from a delusional disorder and/or severe depression with possible psychotic features. These doctors never testified that the defendant lacked the capacity to premeditate or to act intentionally or knowingly because of a mental disease or defect. During their brief examinations, the defendant did not display symptoms indicative of insanity or mental incompetence. In addition, neither doctor had discussed the facts of the attempted murder with the defendant, so neither one was prepared to speculate that at the time of the shooting the defendant lacked the capacity to form the requisite intent for attempted first-degree murder.

The trial court correctly determined that the defendant's evidence did not meet the relevancy standard set out in *Hall*, and we affirm the ruling excluding the evidence.

### III.  Jury Instruction: Lesser-included Offenses

The defendant's final attack on his attempted first-degree murder conviction is that the trial court improperly refused to instruct the jury on the lesser-included offenses of attempted voluntary manslaughter and attempted criminally negligent homicide. Determining which lesser-included offenses should be submitted for the jury's consideration is a mixed question of law and fact; consequently, the issue is reviewed *de novo* on appeal with no presumption of correctness. *See State v. Bowles,* 52 S.W.3d 69, 74 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). As we shall explain, the defendant is entitled to no relief on his claim.

We can quickly dispose of the second part of the defendant's lesser-included offense argument relative to attempted criminally negligent homicide. Tennessee does not recognize the crime of "attempted" criminally negligent homicide because a person cannot intend to perform an unintentional act. *State v. Donald Eady, Sr.*, No. E2000-01940-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, July 30, 2001). Ergo, the trial court did not err by refusing to charge a nonexistent offense.

As for the failure in this case to charge attempted voluntary manslaughter[3], three issues must be considered: (1) whether the offense qualifies as a lesser-included offense; (2) whether there is evidentiary support for an instruction on the lesser-included offense; and (3) whether any failure to instruct is harmless. *See Burns*, 6 S.W.3d at 467-69.

---

[3] Unlike "attempted" criminally negligent homicide, "attempted" voluntary manslaughter is an offense. *See State v. Howard Martin Adams*, No. 03C01-9403-CR-00123 (Tenn. Crim. App., Knoxville, Jan. 1, 1995).

Turning to the first issue, the law is settled that voluntary manslaughter is a lesser-included offense of first-degree murder. *State v. Sims*, 45 S.W.3d 1, 21 (Tenn. 2001); *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). Likewise, attempted voluntary manslaughter is a lesser-included offense of attempted first-degree murder. *See State v. Jake Christopher Reynolds*, No. M2000-00210-CCA-R3-CD (Tenn. Crim. App., Nashville, May 23, 2001) (defendant charged with attempted first-degree murder; evidence sufficient to sustain conviction of lesser-included offense of attempted voluntary manslaughter).

Next, we consider whether the evidence justified an instruction on the lesser-included offense of attempted voluntary manslaughter in this case. *Burns* devised a two-prong analysis for our use.

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

*Burns*, 6 S.W.3d at 469. This "justification" inquiry has been fleshed out in decisions subsequent to *Burns*, the most recent of which is *State v. Walter Lee Allen*, – S.W.3d –, No. E1998-00416-SC-R11-CD (Tenn., Knoxville, Feb. 22, 2002), wherein the failure to instruct was held to be reversible error.

The lesser-included offense issue in *Walter Lee Allen* concerned the trial court's failure to instruct the jury on facilitation of robbery as a lesser-included offense of the charged crime of aggravated robbery. The only lesser-included offense submitted to the jury in that case was robbery. The jury rejected the greater offense and convicted the defendant of robbery. Pursuant to *Burns*, the court categorized facilitation of robbery as a *Burns* part (c)(1) lesser-included offense of aggravated robbery "because it is facilitation of an offense [robbery] that otherwise meets the definition of a lesser-included offense [of aggravated robbery] in part (a)." *Id.*, slip op. at 5.

The proof in *Allen* showed that the defendant "stood silently in the doorway of the [Fast-Stop Market] as his accomplice robbed the clerk at gunpoint." *Id.*, slip op. at 6. Although there was no dispute that a deadly weapon was used in the robbery, the court, nevertheless, concluded that the evidence justified an instruction on facilitation of robbery, which does not require proof of the use of a deadly weapon. The basis for that conclusion guides our analysis in this case.

Robbery is established by proof of "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (1997). Use of a deadly weapon or serious bodily injury are the features that distinguish aggravated

robbery from robbery. *See* Tenn. Code Ann. § 39-13-402(1), (2) (1997).[4] Robbery is a lesser-included offense of aggravated robbery under *Burns* part (a) because all of the statutory elements of robbery are included within the statutory elements of aggravated robbery.

In dealing with a *Burns* part (a) lesser-included offense, the "general rule," according to the *Allen* court, is that "evidence sufficient to warrant an instruction on the greater offense also will support an instruction on a lesser offense," because "[i]n proving the greater offense the State necessarily has proven the lesser offense." *Walter Lee Allen*, slip op. at 5. *Allen* dispels the previously prevailing notion that in the *Burns* part (a) situation, an instruction is not required unless reasonable minds could accept that "only" the lesser offense occurred. *Id.*, slip op. at 6. In other words, "the *Burns* analysis does not preclude finding that the same evidence supports an instruction on both the greater offense and the lesser offense." *Id.* For this reason, the lesser-included offense instruction actually given in *Allen* for simple robbery was justified and proper despite that the evidence of the gunpoint robbery of the market clerk was undisputed.

The implicit justification for instructing on lesser-included offenses under *Burns* part (a) does not, according to *Allen*, "extend" to *Burns* part (c) lesser-included offenses. *Burns* part (c) classifies facilitation, attempt, and solicitation as lesser-included offenses. However, because proof of the greater charged offense will not automatically prove facilitation, attempt, or solicitation, the justification analysis is required.

After a careful examination of the record, the *Allen* court concluded that evidence existed that reasonable minds could accept as to the offense of "facilitation" of robbery. The evidence, the court found, also was legally sufficient to support a conviction for that lesser-included offense. The court explained,

> [The defendant] displayed no weapon and took no property from the victim. There was no evidence that he received any proceeds of the robbery. The jury could have reasonably concluded that [the defendant] did not share the intent of his accomplice even though he knowingly furnished substantial assistance by blocking the door. Furthermore, consistent with the general rule [for *Burns* part (a) lesser-included offenses], the proof of aggravated robbery in this case necessarily proved robbery. Therefore evidence existed that reasonable minds could accept as to the offense of facilitation of robbery.

---

[4]

**39-13-402. Aggravated robbery.** – (a) Aggravated robbery is robbery as defined in § 39-13-401:
    (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably it to be a deadly weapon; or
    (2) Where the victim suffers serious bodily injury.
    (b) Aggravated robbery is a Class B felony.

*Allen*, slip op. at 6.

In the case before us, both the charged offense and the defense requested lesser-included offense are "attempt" crimes. The trial court charged all modes of "attempt" in connection with first degree murder and in connection with second-degree murder. Attempted second-degree murder was submitted to the jury as a lesser-included offense. We noted earlier that attempted voluntary manslaughter is, indeed, a lesser-included offense of the charged crime of attempted first-degree murder; however, attempted voluntary manslaughter is not a lesser offense under *Burns* part (a). *See State v. Dominy,* 6 S.W.3d 472, 477 n.9 (Tenn. 1999) ("passion" language in the definition of voluntary manslaughter simply reflects a less culpable mental state than required for first or second degree murder). Consequently, the general rule set out in *Walter Lee Allen* for *Burns* part (a) lesser offenses does not control the justification analysis.

Nor is attempted voluntary manslaughter a lesser-included offense under *Burns* part (c), which specifies that an offense is a lesser-included offense if

> (c) it consists of
>
> (1) facilitation of the offense charged . . . ; or
>
> (2) an attempt to commit *the offense charged* or *an offense that otherwise meets the definition of lesser-included offense* in part (a) or (b);
>
> (3) solicitation to commit the offense charged . . . .

*Burns*, 6 S.W.3d at 467 (emphasis added). Attempted voluntary manslaughter is not an "attempt" to commit "attempted" first-degree murder (the charged offense) or "attempted" second-degree murder (a lesser offense that was charged in this case).

Attempted voluntary manslaughter, however, is a lesser-included offense of attempted first-degree murder under *Burns* part (b). *See Dominy*, 6 S.W.3d at 477 n.9. While *Walter Lee Allen* stated that the general rule for *Burns* part (a) lesser offenses does not extend to part (c) lesser offenses, without mentioning part (b) offenses, we see no reason why part (b) and (c) lesser-included offenses should be analyzed differently. As with lesser-included offenses under part (c), proof of the greater offense will not necessarily prove the lesser-included offense under part (b).

The proof in this case showed that the defendant calmly entered the victim's house, walked up to her, told her to hang up the phone and that he was there to kill her, pointed a revolver at the victim while telling her that he was "tired of being used," and then discharged the gun into her sternum. Claiming that he did not remember shooting the victim, the defendant could not and did not dispute the victim's version of the attempted homicide.

-10-

This evidence does not raise an issue of passion upon adequate provocation necessary for voluntary manslaughter. The jury in this case was not obligated to believe the victim's account of the defendant's statement and demeanor when he shot her; however, in that scenario, the jury would have had no basis for finding that the defendant acted passionately upon adequate provocation. In such a situation, reasonable minds could not find that the defendant committed attempted voluntary manslaughter by being adequately provoked into a passionate act. *See State v. James Wesley Osborne*, No. E1999-01071-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Knoxville, June 14, 2001), *perm. app. denied* (Tenn. 2001); *State v. Robert Lee Paytee*, No. M2000-00257-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Nashville, May 3, 2001), *perm. app. denied* (Tenn. 2001); *State v. Edward Lee Mooney, Sr.*, No. 02C01-9508-CC-00216, slip op. at 8 (Tenn. Crim. App., Jackson, Dec. 30, 1998). Thus, the evidence does not warrant an instruction on the lesser-included offense of attempted voluntary manslaughter.

In the event we err in making this last determination, we now examine whether the failure to charge attempted voluntary manslaughter was harmless error. An erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court determines beyond a reasonable doubt that the error did not affect the outcome of the trial. *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001). There is general agreement that the constitutional error in failing to instruct may be declared harmless when the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses. *Walter Lee Allen,* slip op. at 7; *State v. Williams*, 977 S.W.2d at 106.

In *Walter Lee Allen*, the court took the opportunity to provide additional guidance on when an instructional error may be harmless, outside the *Williams* scenario. We are not required to visit that harmless-error aspect of *Walter Lee Allen*, however, because by finding the defendant in this case guilty of attempted first degree murder, to the exclusion of the charged immediately lesser offense of attempted second degree murder, the jury necessarily rejected all other lesser offenses. Had the failure to instruct been error, therefore, it would have been harmless beyond a reasonable doubt.

Now having reviewed and considered the issues raised on appeal, we affirm the judgment of the trial court in this case.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-